We will hear argument next this morning in Case 13-1080, Department of Transportation v. Association of American Railroads. Mr. Gannon. Mr. Chief Justice, and may it please the Court, the Court of Appeals held that Section 207 of PREA was unconstitutional because it believed that the statute constituted an actual delegation of regulatory authority to a private entity. And none of those three things is true about this statute. First, under LeBron, Amtrak should not be considered a private corporation for non-delegation purposes. Second, the metrics and standards are not regulatory. The regulatory effect here comes from the longstanding statutory preference requirement, which was enacted by Congress, not Amtrak, and is enforced by an independent adjudicative agency, the Surface Transportation Board. And third, go ahead, please. And third, requiring Amtrak to approve the metrics and standards before they went into effect is not a delegation outside the government under this Court's cases. Kennedy. I think the LeBron argument, Marsh v. Alabama, the Company Town case, no one says that it was a governmental agency. It was just exercising governmental-like powers, which entitled the person to exercise free speech. That's all LeBron can stand for. You wouldn't say that in Marsh v. Alabama, the Company Town was a governmental agency after reading that opinion, would you? No. I would say that after reading the opinion in LeBron, that the Court concluded that Amtrak is a governmental entity for things that Congress doesn't have control over. Well, you could say the same thing about Marsh v. Alabama. Well, I think that the difference is that the Court recognized in LeBron that Amtrak is a government-created corporation that is under the government's control, and that under the government's control both because of the management control that it has over it and because it created the purposes for which Amtrak exists and the things that it has to do. And the Court there distinguished between whether Amtrak is governmental for constitutional purposes that were beyond Congress's control, but acknowledged that Congress could control whether Amtrak was governmental for other purposes, other powers and privileges of government. If Amtrak is governmental for nondelegation purposes, is it also governmental for Appointments Clause purposes? Well, I think that that follows from the way the Court approached the question about the PCAOB in Free Enterprise Fund, where Congress had also enacted a statute that said the PCAOB was not an agency or instrumentality of government, that no board members or employees were going to be considered officers or employees of the Federal government. The parties in that case, which included the United States, did not dispute that the Appointments Clause and separation of powers concerns that were at issue there were applicable to the PCAOB, notwithstanding those general statements by Congress. And we do think here that it's not. I was just going to say, your argument that Amtrak is governmental for purposes, that doesn't get you to the finish line, right? I mean, if you had a law that said the Department of Defense and the Department of State will consult and jointly issue regulations, and if they don't, this private individual resolved it for them, that would still present the same problems. Well, I think, Mr. Chief Justice, you're referring to the arbitrator provision. Right. Before we get to the arbitrator provision, I do think that this would resolve the question. And ultimately, if this is not regulatory authority that cannot be conditioned on the question. It wouldn't resolve the question, only perhaps for delegation purposes. But it doesn't resolve the other issue in the case, which is due process. That is to say, even if this is a governmental entity, there are some things that governmental entities can't do. And indeed, I think that the case law in this area relies on the due process clause more than on the distinction simply between public and private entities. Well, to be sure, the Carter Cole case talked about both non-delegation ideas and also due process issues. We would be surprised if the Court wanted to decide the due process issue here, since it wasn't decided by the court of appeals. It was raised. It was raised. It certainly was raised. It's argued here. It has been argued in the red brief here. And we do think that we are correct on the merits with respect to the due process issue, and that for two principal reasons. One is that what is at stake here is not the equivalent of what was going on in the due process cases. This is not like the de-licensing of optometrists in the Gibson v. Berryhill case. It's not like the wage and hour requirements in Carter Cole, because the analogy to those things here is the statutory preference requirement rather than the antecedent metrics and standards. Scalia. But the statutory preference requirement requires or would require consideration of whatever is determined by this body, right? The statutory preference requirement is independent of the metrics and standards and preexists them. That is what the Surface Transportation Board would be enforcing in a proceeding under Section 24308F. The metrics and standards. Scalia. What does it consider? The metrics and standards play a triggering and gatekeeping role. These provisions are reprinted in the government's brief on pages 15a and 16a of the appendix. The investigation by the Surface Transportation Board is triggered by there having been a failure by Amtrak to satisfy the metrics and standards. But I think that that is, if we're talking about the due process cases, that is not the prohibition that the Court has been concerned about. If you look at cases like Robertge, which talked about CUSAC, it said that it's okay to have something that is presumptively bad banned by the legislature. Here, the analogy to that is the statutory preference. And it's okay, then, to allow a private party to relax its application in certain circumstances. And we think that's the role that the metrics and standards play here, because Congress could have allowed Amtrak to ask for an STB investigation into violations of the statute any time it wanted to. And instead, what they said is that it is only — you're only going to get that to perform at an adequate level, such that we think there's been adequate injury. And then in that investigation, you're going to have to establish that the injury to you was caused by the violation of the statute. Kennedy, in your view, the case would come out the same way if Amtrak could issue these metrics and standards entirely on its own, without consultation with the government or cover operation with the government. Same case, same result. One of the — one prong of our argument is, yes, that because this is not regulatory in that sense, this is more like the neighbors being able to veto the billboard in the neighborhood in CUSAC, which the Court said was okay in Roberge, because the statutory preference is presumptively bad. Violations of the statutory preference by the freight railroads were the thing that Congress wanted to be enforceable here, and the metrics and standards just cabin the circumstances in which Amtrak can seek that type of enforcement. If I could return to the Chief Justice's question about the arbitrary— Sotomayor, do the metrics and standards stop you from initiating, or stop the agency from initiating a review even if a carrier meets the metrics and standards? Well, it's not the carrier, it's not the host railroad that would meet those standards. No, no. It would be Amtrak's own performance, but there's — that would depend upon the reading of the beginning clause of F-1, which refers to if on-time performance fails to satisfy 80 percent for two consecutive quarters, or the service quality isn't complied with for two quarters, then those are the circumstances in which an investigation could be requested, and in which instance the STB would need to start the investigation, or the STB could initiate the investigation. And there's an open question about that first clause, about whether the 80 percent on-time performance reference is something that has to be predicated upon the metrics and standards. That's been briefed before the Surface Transportation Board in the proceeding brought against Canadian National, the complaint of which is reprinted, a snippet from which is reprinted at the end of the Joint Appendix. So the question there would be whether on-time performance there depends upon a pre-PREA definition rather than the ones that are included in the metrics and standards. So there's a possibility that the agency could— Sotomayor, I'm not sure that this is not a regulatory action. Would that satisfy the entire case? We wouldn't have to go to the delegation issue or to whether it was public or private, et cetera. I think that that's right. And I think even in those circumstances, because it — because if it is not regulatory, it's okay for private persons to have that power. I think that would cover even the question of whether — if the arbitrator is assumed to be private. That is not what we think is the case. And we also think that we don't have to win on that argument either on the question of whether it is— Roberts. If the actions are not regulatory, why did Amtrak's performance drop dramatically as soon as the Court issued its decision in this case? Well, I think that's because of the — that had decreased the threat of enforcement of the statutory preference. I do think that the — it is the statutory preference that is having the regulatory impact here. The freight railroads are not going to be held liable for Amtrak's failure to satisfy the metrics and standards. They're going to be held liable for failing to— They're going to be — Amtrak can then force a proceeding at which the freight carriers will have to defend, right? That is correct. And the same thing— Well, that's a significant regulatory impact to tell the railroads, I, a private party, get to start governmental proceeding and you have to show up to defend it. Yes. And by the way, if I don't — it's triggered if I don't comply with standards that I get to set. It's — but we allow private parties to initiate governmental investigations and enforcement proceedings all the time, either before administrative agencies or courts. And we don't think that that is a delegation of legislative power to the person who is beginning the investigation. Is the — is the government able to award damages without the showing that there's been a violation of the metrics and standards? No. That is — that is going to be a threshold determination. But as I said, that is serving as a threshold gatekeeping function to — of limiting the circumstances in which the investigation can begin when there will be damages. But I would think if that's the case, if the statutory preference does not get — if a violation of the statutory preference doesn't get you all the way to damages, if there's essentially a second requirement, which is a violation of the metrics and standards, I mean, in effect what the statute does is it says there are two things you need to show, a violation of the preference and a violation of the metrics and standards in order to get damages. That seems — if that's the case, it seems kind of regulatory. Well, I — I understand the impulse, but I think that it seems — it also seems like the ability of the neighbors to veto the billboards in CUSAC, because what Amtrak — all Amtrak has done is relaxed certain circumstances in which the freight railroads can be held liable for violating the statutory preference. A violation of the statutory preference is presumptively a bad thing. And what's happened here is Congress has recognized that if it doesn't actually cause Amtrak to be — to have sufficiently subpar performance, then we're not going to make a Federal case out of it and we're not going to let Amtrak do so. But — and there aren't going to be damages at the end of the day. But I do think that the real-world reason why the freight railroads had greater incentive to cooperate, and Amtrak believes that it was their cooperation under the regime in that there was still the possibility that there would be enforcement proceedings before the STB to determine whether the freight railroads had failed to comply with the statute. Statute says that the — Ginsburg. Can we get back to the arbitrator? I think the Chief asked that question. We'll pass and assume it's regulatory. Yes. The arbitrator, it's argued, need not be a government officer, could be a private officer. I have a question to ask about that provision. Is it — is this a one-time operation that is setting these metrics and standards? In fact, there was no arbitrator in this picture. Will there be a renewal of this, a repetition, where there might be an arbitrator? Well, I don't think that the terms of 207d contemplate that the arbitrator will come into effect again. I think that because the beginning of it says that it is only triggered if the development of the metrics and standard is not completed within the 180-day period required by subsection A, which is the 180 days after PREA was enacted in 2008. And so the arbitration provision was, I think, good for one time only. It was never invoked. Well, but does that matter? I mean, the idea is that having the arbitrator, arbitration provision there affected the issuance of the regulations. Yes, I understand that question, Mr. Chief Justice. I think that it mattered the first time around to the extent that there may be any amendments to the metrics and standards in the future, the arbitrator wouldn't be applicable. We do not think that the best reading of the arbitrator reference is that that would be a private person. We think that the issues are pretty intertwined here, so I know it's a difficult thing to keep track of for you and for us. But if we think that the regulations have or regulations, not to load the question. Metrics and standards have a regulatory effect. Metrics and standards are regulations. And if we think there's nothing in the statute that requires – well, I guess it doesn't really matter. If that's the case, is the arbitrator an officer of the United States? In other words, if he is the one that ends up issuing what we will hypothetically conclude are regulations. I assume he has to be an officer of the United States. I think that would constitute significant governmental authority under Buckley v. Vallejo. You know, I'm quite interested in the government's view of this case, and I hope you will calm me down. The reason that I find it interesting is because it seems to me there are hundreds, maybe thousands, of organizations that set standards for the industry. And some of them operate under government memoranda or authority that ask them to do it, the most noted being ICON, which sets all the standards for the Internet. Now, it also seems to me very possible that a member of such an organization that fails to follow the standard could run afoul of other government rules or other agency rules or other laws, for example, by stalling the Internet delivery of services and being delayed and violating some IFCC requirement. And since I know that there are about 200 or 300 international organizations that we belong to to do such things, I just wonder what the implications would be if you lose this case. That is to say, if this Court held here that if a government, say Congress, agency, Commerce Department, says to a group of private people, set standards, and then if they fail or if they do so and a member fails to meet a standard, it runs afoul of a government, it runs afoul of some such thing, were we to hold that unconstitutional, I have a feeling that this is what I want assurance on, that I'm wrong, that it would work havoc possibly with the Internet, possibly with industry throughout the United States, I know not where, possibly in communications, possibly with the 200 or so organizations regulated by treaty. Now, you've looked into this more than I, and therefore, I want you to calm me down and say, no, this isn't a big deal case, don't worry about it. I think it depends upon how broad the Court's ruling is. I think it's a broad case. Breyer. No, no. The ruling is narrow. It just says the following. It says, these are standards which equal legislation and as a result of these standards being legislated by this, I think, Quango or something or whatever, by this particular entity, bad things happen to freight trains when they fail to meet the standards or something, they violate some other law, and that's all unconstitutional. I mean, frankly going back to Carter v. Carter Coe, as if we could go back to Lochner. I don't think that Respondent is asking for a ruling of that nature, and I think that the question here would be because of the role that the metrics of standards play in the STB investigation. I think that would be the only way in which the Court would conclude that it is tantamount to regulations. We don't believe that they have that effect. We don't think that other standards that are conditions for application of the law out there in the world have necessarily the same effect under even Respondent's view of the case. And so I think that the one you want to get reassurances from is actually Respondent, that the nature of their challenge is narrower than that. But if I could return to the arbitrator. Roberts. Roberts. I know it's a – if he is an officer, is the government's decision, is he a principal officer or an inferior officer? I think that he would be an inferior officer, given the limited nature of the STB. Okay. Then who's – which principal officer supervises him? It would be the STB that appointed him. But he's an arbitrator. He's an arbitrator. One of the parties to the arbitration. I don't think the STB is a party to the arbitration. I think that the two parties who have to issue the metrics and standards are Amtrak and the Federal Railroad Administration. It's if they don't agree, then an arbitration – the arbitrator would be resolving a dispute, not the – the STB wouldn't be a party to it. So if the STB doesn't like the arbitrator's decision, can the STB change it under the law? I doubt it because it's supposed to be a binding arbitration. But we think that from the beginning, this is yet another reason to construe the arbitrator as being somebody who is governmental, probably somebody who is actually at the STB. I don't see how you can say he's an inferior officer. He's supervised by nobody. That's what we have held to be the – the touchstone of principal versus inferior. He's appointed by the super – the surface transportation board. That's it. And supervised by nobody. He performs a limited task. He could be removed by the STB. A limited task is – is not the touchstone. I mean, that's what we said in Morrison, and we repudiated it in a later case, which said the touchstone of a – of a principal officer is whether that person is not subject to control by somebody else. And I don't see how this person is subject to any control in – in the task that he's assigned. Well, in that sense, it's consistent with Morrison, and it is not consistent with what the Court said was sufficient to answer the question in Edmond, but did not say was necessary to answer the question in Edmond about there being review within the executive branch of the decisions being made by the Coast Guard judges there. Let me talk about regulatory effect. As I understand it, once these – what do you call them? The metrics and standards. Metrics and standards. Once they were issued, wow, the on-time record of ANTRAC went way, way up. So they had a very immediate and clear effect on the behavior of – of the parties. Now, do you think that because the sentencing guidelines are now just advisory, that we could have the sentencing guidelines issued by some private party that – that is not appointed pursuant to the requirements of the Constitution? Because, after all, they're just advisory. Now, the reality is they have a significant effect on the behavior of lower courts. And I think it's the same thing here. There's a significant effect. I don't know how you see it. I don't think that this is the same as the sentencing guidelines, the effect that it has on the judges, because those are advice to the judges. Here, what the metrics and standards do is they satisfy conditions in the world when the Federal statute is going to be applicable. It's in that sense just like the Court contemplated in J.W. Hampton or indeed in cases like Kern v. Wallace and Rockwell Cooperative, where the policy was established by the Federal government, the Secretary of Agriculture wanted to put a price order in effect or to say that a particular tobacco market would be subject to a Federal inspection regime, and that could not occur until it was – until there was approval from private entities. Sotomayor, why did the record improve so – so radically? Because for the first time in decades, there was a meaningful threat that there would be an enforcement proceeding not to enforce the metrics and standards, but to enforce the statutory preference requirement, which is not challenged here, which was not written by Amtrak, and which would be enforced by the Surface Transportation Board in an independent adjudication in which they would take evidence from both sides and determine what the real story was. There's a – Sotomayor, can I go back to my question? Okay. Can the STB on its own start an investigation? I – I – If – if it gets – That depends, Justice Sotomayor, on – on the answer to, as I said, is an unresolved question about whether the 80 percent on-time performance trigger at the beginning of 24308F1 is – is read as being confined to the on-time performance metrics and standards that were adopted under PREA, or whether that can be a reference to a pre-PREA on-time performance metric. And so for decades, Amtrak, pursuant to ICC – originally pursuant to an ICC order, used end-point on-time performance metrics that looked very much like the ones that were ultimately adopted by the FCC standards here. I think that the sentencing guidelines are a pretty good example. You do have the model penal code. We have law professors telling judges what to do all the time. We have judges who receive information in briefs. We had lots of guidelines commulgated by the States. There are all kinds of systems, and judges do use them, and some of them do have practical effect and make a difference. But once this Court starts down the road, and it would be starting because I am aware of no precedent, once we start down the road of saying Congress cannot tell even a private agency to go and make some standards, which we all know will be followed, once we start down that road, there is no stopping place, and therefore, the measure is nothing to do with separation of powers. It is exactly what Justices Cardozo, Hughes, Brandeis, and Stone said in Carter Coe. The measure is the due process clause, and we're all off on something of a wild goose chase in this case. That's what is suggested to me by the sentencing guideline analogy. Well, wow, I didn't mean that. To the extent that Justice Scalia also doesn't see a non-delegation problem in Carter Coe, then I take it that you are agreeing. But I think here that the criminal sentencing context may present different issues. And I do think that the basic reasons why the due process issue is not one where we would have a problem is both because of the — what we think is the fact that this is relaxing the regulatory effect of the statutory preference, and secondly, because those cases about bias in the due process context involve the entity that's actually doing the adjudication. And here the analogy is — that's the STB is acting as the board of optometrists in the Gibson v. Berry law. Kennedy, I think it was the Respondent's brief in which they gave the hypothetical. Suppose that the government, together with auto manufacturer A, made standards, but then auto manufacturers B and C had to follow them. That seems wrong. Why is this different? I take the point that that seems wrong. We don't think that this is the equivalent of regulating the automotive industry because Congress has put the regulation in place. That's the statutory preference requirement. This is something in which automobile manufacturer A would be in advance saying, I, automobile manufacturer A, am not going to pay what you ask for. Suppose Congress put that in place. Suppose Congress said, and once this is promulgated, all manufacturers have to obey it. I think that that would, without the Federal agreement that we also have here, the Federal Railroad Administration's contemporaneous agreement with the standards, that would — that would present non-delegation problems. But if I could reserve the remainder of my time. Roberts. Thank you, counsel. Mr. Dupree. Mr. Chief Justice, and may it please the Court. The Constitution does not permit Congress to create a corporation, deem it non-governmental, then launch it into the commercial sphere with a for-profit mandate, and invest it with regulatory authority over other companies in the same industry. The text of the Constitution places all legislative power in the Congress. Although this Court has approved grants of rulemaking authority to executive branch agencies or judicial branch agencies, it has never approved a grant of regulatory power to a private corporation. Whether you deal with that, I think, is a question. Scalia. That's the big problem here, regulatory authority. As far as I'm concerned, that's the — that's the big difficulty. Why is this an exercise of regulatory authority when all it does is enable an investigation? Well, Justice Scalia, I don't think it's quite correct to say all it does is enable an investigation. For one thing, there's the provision in Section 207C that requires the freight railroads to amend their contracts with Amtrak to the extent practicable to incorporate the metrics and standards. So there is a direct regulatory command on the freight railroads. But beyond — Well, but to the extent practicable. I mean, what does that mean? Well, unless it's a null set, Justice Kagan, it has to mean something.  are — So instead you want a rule of — a rule that lets DSTB investigate even when you have one failure to accommodate? Well, I'm not sure that's the rule we want, Justice Sotomayor, but at least that would have the merit. You would prefer that. Well, it would at least have the merit of being constitutional. In other words, the problem here is not necessarily the scope of the investigatory power. It's the fact that Congress gave Amtrak the pen or co-authorship of the regulation. That's the constitutional device here. Justice, the Department of Commerce, acting under authority from Congress, gave ICON the power to write standards for the Internet. Well, and, Justice Breyer, let me address your concern head on, because we've been litigating in this case against the government for several years now, and to my knowledge no party involved, the parties, the amici, have foreseen the dire consequences that Your Honor plans to have. I'm not saying there's a dire consequence. By coincidence, I happen to be reading about the Internet. I'm trying to learn about something. Well, Justice Breyer, I can make a few points in response. One is that in the ICON case, that's not a situation where you have a company trying to regulate other competitors in the market. That's one difference. Another difference is that a lot of these organizations tender their proposed standards to the agency for approval. So at the end of the day, it's the agency that has the final say in many cases. That's this model that Congress enacted. And here, Congress plainly could have given Amtrak an advisory role. Section 207a gives all sorts of entities and participants with a stake in these rules an advisory role, and there's absolutely no reason that Congress could not easily have drafted that statute to give Amtrak an advisory role. Ginsburg. But if the government agency, the FRA, if it says no to what Amtrak proposes, the government's assent is essential to this scheme, right? That's correct, Justice Ginsburg. But I think the key point here is that Amtrak's assent is also essential. So to be sure, the government could halt a regulation that Amtrak wanted to put in effect, but the constitutional vice here is that Amtrak has the same power. It could prevent the government from putting the government's preferred regulation in place, and that's giving too much power to a private entity to be able to dictate to the Federal Government what regulations will be issued. You don't have to answer this question, but have you thought through what this means for what I think is called the Ball Conference, where you have groups of regulators and banks meeting together to determine what they're going to do about interest rates, money supply, et cetera? You have not, is the answer, and I don't know enough about it, so skip it. Very good. Well, but then how do you do you say that we were just playing wrong when we let the tobacco industry and milk producers veto regulations in our two prior cases, Carrion and Rock Royal? Yes. The difference in those cases, Justice Sotomayor, is that in those cases, it was the Federal Government that drafted the regulation. And what happened at that point was that Congress gave the industry, or in those cases a supermajority of the industry, the power to vote whether to subject themselves to the regulation. And the distinction there is between the government exercising the legislative authority and the private company determining when that authority is effective. That's – that line is too thin for me. But because consent, to me, means it has to satisfy both parties. And that's no different than a veto. This is the STB saying, this satisfies us, this is what we would like to do. Amtrak, is this – are you willing to be regulated, just like the tobacco – the tobacco industry and the milk producers? Well, for one thing, my clients, the regulatory parties, were not given a say in this. So to say Amtrak is this is what you want. That's the due process. That's the due process. Fair enough. Then with regard to Your Honor's point – That's fair enough, by the way. That's – that's an issue that's fair enough, but – and subject to more talk. But I'm not quite sure why this becomes – And with regard to Your Honor's earlier point about that being a thin line, I understand that, but at the same time, that is the line, the precise line that this Court explicitly drew, both in Kern and in J.W. Hampton, where it said that allowing this vote of the regulated parties, that doesn't amount to legislative action. Agreed, it may be a fine line, but it is the line that this Court has reverted to time and again. I don't know what they meant, because they were subjecting themselves to standards. Well, and I would simply go back to our point that we never had a vote in this process. Now, I think for not just themselves – Justice Alito, I think in that situation, what would likely happen if there was a Federal government that would agree to the incorporation of the metrics and standards into an operating agreement, is there anything that the Federal government could do? Well, Justice Alito, I think in that situation, what would likely happen, if the Federal  government, if Amtrak and the Freight Railroad could not reach agreement, and therefore there was no agreement on the terms of the operating agreement, is that the Surface Transportation Board ultimately would be called upon to step in and essentially dictate terms, or help the parties reach terms and prescribe the terms of the operating agreement. And I think in that situation, again, it hasn't yet arisen, but it would not surprise me in the slightest if Amtrak's argument at that point to the Surface Transportation Board was pointing to the language of 207C and saying, this Freight Railroad is under a statutory mandate that it shall amend its agreements to the extent practicable, and nothing in the statute suggests that the determination as to practicability is something that falls within the exclusive jurisdiction of the Freight Railroads. The statutory language doesn't suggest that. If this Court were to hold that, I certainly wouldn't quarrel with it, but I'm not quite sure the statutory language gets you there. I think one fundamental flaw with the statute, which we have not yet touched on, an is accountability. That, of course, is the concern that has animated this Court's nondelegation in due process jurisprudence. And here you have a situation where Congress, the President, and Amtrak itself have repeatedly declared to the public in explicit terms that Amtrak is not the government. Kagan, because I've always thought that the labels that Congress decides to put on these things is not of particular relevance. I'm not sure I would go so far as to say it's dispositive, Justice Kagan, but I do think it's highly relevant. I think when this Court has spoken about transparency and accountability in the legislative process, what it's been talking about is the ability of the public to look at a regulation or a law and make a judgment as to where to assign blame. And when you have all parties involved assuring the public that Amtrak is not a government actor, I think the public is entitled to take the President and the Congress at their word and say that this is not the animal as it exists. Ginsburg, the government exerts control over Amtrak as a policymaker. It's got this Amtrak, you will agree, is not like a private corporation. It's there's a great deal of Federal involvement in Amtrak, right? I agree. I agree. But I think what resolves this case is the fact that Amtrak, it operates under a statutory mandate to conduct its affairs as though it were a non-governmental entity and a for-profit corporation. In fact, in the brief The Post Office is supposed to be a for-profit corporation, too, to the same extent, right? Well, yes, Justice Kagan. Keep in mind, the Post Office is expressly created as a Federal entity. It's in our Constitution, and in Federal statutory law, it says the Post Office is an agency or an entity within the executive branch. But then that all goes back to labels. I mean, I guess I'm just wondering what about Amtrak is not governmental other than the label? Well, again, we've seen It's subject to the policy control of Congress, which Congress exercises pretty much on a routine basis. It's entirely funded by Congress. All the members of the board are appointed by the President with the advice and consent of the Senate, save the save one. You know, I guess I'm just wondering, other than this label, what suggests that this is not the government? Well, first, I would take issue with just the label. In other words, the organic statute of Amtrak in the U.S. Code says it is not the government. So it may be a little more than just a label.  But I would take issue with the fact that the argument for non-delegation purposes is that Amtrak's officers and employees are not Federal employees, they don't take an oath of office, and they are constrained by various financial incentives and statutory mandates to operate Amtrak, not in the common good, not as a neutral, disinterested regulator would, but as a for-profit commercial actor. That's actually the very point that Amtrak made to this Court in its LeBron brief, where it said, keep in mind, we are not neutral government regulators. We are hungry capitalists. That's how we run Amtrak. We have the ---- Kagan. We rejected that argument. Well, it rejected the ultimate constitutional conclusion for purposes of the First Amendment claim, but I don't think this Court took issue with the fact that Amtrak's officers and directors have said from day one, very publicly, that we don't govern in any sense. We are not neutral, disinterested regulators. We are a for-profit business. And that's what makes this case different, Justice Kagan. So, I mean, for that purpose, what difference does it make, whether it's a governmental underheat or not? So long as it is operating on a for-profit basis and is giving the last word on some regulatory matters that disadvantage its competitors, there's a violation of new process. I don't see how it makes any difference whether you call it governmental or not. Justice Scalia, I certainly agree 100 percent with you on the due process point. I think that whether it's government or nongovernmental may play a role if this Court were to approach this case through the lens of nondelegation. But as far as due process goes, Your Honor is exactly correct. No matter what we call Amtrak, the question ultimately at the end of the day is whether this federally chartered corporation, with all of the various financial incentives, statutory mandates and commands, can exercise regulatory power over other commercial actors in the marketplace. The due process question wasn't aired below at all, isn't that so? It was aired below, Justice Ginsburg. We have fully briefed due process at every stage of this case, as has the government. The district court resolved it on the merits, and the D.C. Circuit didn't need to reach it because it resolved it on nondelegation grounds, but it did drop a footnote and said nondelegation and due process are so closely intertwined in this context, and frankly, we're not sure, as Justice Scalia suggested, whether it ultimately would make a difference. So that's why it took the nondelegation, but there's no question that due process is fully briefed, fully teed up for this Court's review. And not decided by the D.C. Circuit? I beg your pardon? And not decided. That's correct. The D.C. Circuit went on a delegation. That's correct, but as I said, they said in the footnote, footnote 3, toward the beginning of the opinion, that they didn't see much of a difference in this context because Carter-Cole speaks both to nondelegation and due process, and it did an analysis under Carter-Cole. So regardless if this Court thinks that Carter-Cole is more properly characterized as nondelegation or due process, the merits of that question are squarely before  Sotomayor. So are you attacking the statute that says that competitors have to accommodate Amtrak? Is that what you're saying is the due process violation? It's not, Justice Sotomayor. The statute that we're attacking is Section 207 of the CFPB. But the investigation is only going to determine whether you violated the statute's failure to accommodate Amtrak. I don't think that's quite right, Your Honor. In other words, the necessary predicate for liability is not just violation of the preference statute, but also a violation of the metrics and standards. The government needs to prove both. It needs to prove violation of the metrics and standards and violation of the preference work. But can the government – what is the due process violation? That is to say, if the Department of Energy, under delegated authority, says that the makers of the bulbs that are energy efficient must use, and they may choose, any one of the five methods that produces green light or white light or whatever it is, and they are to choose the method, and that's just it. Now, that puts it at disadvantage, those competitors who do not use energy efficient bulbs. Is that a violation of due process? Well, if I'm understanding Your Honor's hypothetical, it doesn't sound like it, because you have a situation where it's the government that's prescribing the regulations. No, it gives them considerable leeway as to make subsidiary decisions. I was trying to make it realistic. They make subsidiary decisions as to how they go about fulfilling the basic energy efficiency mandate. Right. The way Your Honor described that, I just don't think it's a violation of due process. Well, I just describe it now. Right. They have broad authority, but they have to meet certain energy efficient mandates, and they can prescribe standards and so forth that will allow them to do it. Does that violate due process? Because it hurts the manufacturers of ordinary energy bulbs. If we say prescribe standards, it would pose a problem if the standards they are prescribing apply to others in the industry, if the way Your Honor posited it originally, it sounded as though Congress was essentially giving them manuals. It applies. They don't have to meet it. What happens is it gives them an advantage, the way they choose, over non-energy efficient bulbs. That doesn't sound like a due process violation. What is your violation here? I'm trying to figure out what your violation is. The violation here is that Congress has given Amtrak the pen. The what? The pen to write the Federal regulations. And so I'm going to say that the energy department manufactures bulbs. No. And that it keeps the profit from the bulbs on its own. It doesn't have to go deposit it in the treasury. So the so the it is a profit-making entity, and it prescribes standards, as Justice Breyer suggested, that harms other people. That would be a parallel to this. Well, and if that's a situation where the government is both acting in the marketplace as a commercial actor and as a regulator of the industry, that's a problem. But what makes this case, I think, so difficult is that being a commercial for-profit actor is fundamentally incompatible with the notion of being a disinterested government regulator. That's because the essence of the That's what I was I'm trying to get. I started with the statement, I think, that due process, your argument, it didn't matter whether you call them private or public. Am I right? That's right. Okay. Now, let's imagine they're just a company, not the Department of Energy. The Department of Energy has a broad energy-efficient standard. It delegates to the people who make that kind of bulb all kinds of minor interstitial standards to make. They make them. They hurt the energy bulbs, the ordinary energy bulbs. Is that a violation of due process? If so, why? If not, how is yours different? Well, that I think that might be a violation of due process, because in that situation what happens is that the Department of Energy is giving authority to private corporations to set rules, standards that govern the conduct of other private organizations. It will hurt the other private organizations. Right. My reaction was the way you deal with that normally is the statute would be interpreted not to give them the authority to write anti-competitive regulations, and you'd attack it under the antitrust laws. There may be other ways to do it. I've never heard of an example where the due process problem really was a constitutional problem under due process. Now, maybe there are some cases I've overlooked. The only one coming close, it seemed to me, is Carter v. Carter-Cole, which I always put in the same box as Lochner. Now, are we supposed to resurrect that? Is there other authority for that proposition? What is it? Well, Justice Breyer, I do believe that this Court on multiple occasions subsequent to the Lochner era has reaffirmed the core holding of Carter-Cole about delegations to private parties are forbidden. This Court said that in Mistretta. A number of justices have said in separate opinions that that holding remains a long-held. But your due process, I want some authority for your due process point on the private agency. Well, the foundational case we have for due process in this context is Carter-Cole. Absolutely. But again, I simply take issue with Your Honor's suggestion that it's a remnant of the Lochner era. I think it retains its vitality today, as many subsequent opinions of this Court have recognized. Let me address Mr. Gannon's point very briefly, if I may, on the notion that it was somehow the preference requirement that was driving the dramatic change in ANTRAC's performance. The preference requirement was enacted in the early 1970s. So Mr. Gannon is unable to explain why this magical change didn't occur until the metrics and standards came into play. And I'm not saying that the metrics and standards for the first time made it realistic that there would be enforcement of that requirement. Well, first, I would say if that's true, that to me strikes me as a pretty plain regulatory effect in that the metrics and standards are on the books and the freight railroads know that they now need to comply or they're going to face enforcement actions. The government can't do that. I think you can allow a private party to bring an enforcement action. You can allow a private party to bring an enforcement action. And I think the question is, if you allow a private party to bring an enforcement action, then the enforcement action shall be commenced if ANTRAC requests it. I think that would be perfectly constitutional. I agree, Justice Scalia, but at the same time, the problem here is that Congress has given ANTRAC the power to define the terms and to draft the regulations in which it may bring an enforcement action. Mr. Dupree, I mean, one way to look at this on the delegation question, not on the due process question, but on the delegation question, is that there's government all over this at every step, that there's all kinds of supervision of ANTRAC itself, no matter what ANTRAC does, that with respect to the metrics and standards particularly, that there's no way ANTRAC is actually going to be able to get anything unless the FRA comes aboard, and that furthermore, that even those metrics and standards are useless unless the Surface Transportation Board decides to enforce the preference requirement. So there's, like, no place at which a private actor can do something itself in this scheme, it would seem to me. Well, I take the point that the FRA is involved in the development of the standards, but I don't think it follows from that premise to say that Congress can give a private company and the Federal Government joint ownership of the pen in drafting the regulations. That's the problem. And with regard to the issue of government control over ANTRAC, the government conceded in the D.C. Circuit that it did not control ANTRAC on a day-to-day basis, and that includes, for present purposes, the rulemaking at issue. In fact, Congress certainly did not view the Federal Government as controlling ANTRAC in the rulemaking, because if it did, it would not have inserted the arbitration provision. Congress clearly understood that in the context of this rulemaking, the Federal Government did not control ANTRAC. That's why the arbitration provision is in there. Unless there are further questions, we'll ask that the judgment below be affirmed. Thank you, counsel. Mr. Gannon, you have four minutes remaining. Thank you, Mr. Chief Justice. Mr. Dupree stressed the question of accountability, and I think, as Justice Kagan was just pointing out, that there is plenty of accountability here for the Federal Government. The Federal Government's fingerprints are all over not just ANTRAC, but also the metrics and standards, because the FRA had to approve them. On the ANTRAC side here, the metrics and standards were approved by ANTRAC's  And so the notion that this is somebody who is appointed by the eight presidential appointees and serves at their pleasure, and so the notion that this is just somebody down in the bowels of a corporation's day-to-day operations that the Federal Government had no connection with, I think, is misguided. Would you talk about the contract provision? Yes. We think that the We should have raised that in your – I should have raised it in your principle. We think that the contracts provisions are – the statutory provision there in 207 does require the contracts to be incorporated to the extent practicable. We have actually said in our brief that we think that that is something that is largely to negotiation between the parties. There are certain aspects of the metrics and standards that it would not make sense to incorporate into the contracts. And what the statute If they can't come to an agreement, who decides what the contract As Mr. Dupree said, that the – then the dispute goes before the Surface Transportation Board. This is in 24308. And the STP will determine what are, quote, reasonable terms and conditions. Which would include, which would include the requirement that to the extent practicable, the standard set forth by Amtrak be followed. But we don't think that that requires that they be – they're not things that would be binding on the freight railroads. The statute provides that there needs to be an incentive payment. For instance, the statute provides that there needs to be an incentive payment in the contracts. But it doesn't mean that that – the incentive payment now has to correspond precisely to what the metrics and standards are. That's something that's subject to negotiation between the parties. And the extent as your friend said, to the extent practicable, unless the whole thing is nugatory, certainly does not wash out the whole provision. It must have some bite. What bite does it have? I think it was to encourage the parties to ensure that they're now collecting data in systematic ways, that they can nationalize things, that they now measure things in the same fashion. They use minutes instead of seconds or whatever. And also that there are some parts of the metrics and standards that wouldn't make sense to go in the contracts at all, things that have to do with customer service of surveys about – satisfaction surveys about the cleanliness of the cars. And so we – and ultimately, even the canon of constitutional avoidance could be used to prevent that from doing the work that would make it regulatory in this context if that were to make it a problem here. I think that it's also the case that Mr. Dupree is talking about Amtrak as a competitor of the freight railroads, and we think that that's the wrong analogy, that Amtrak is effectively like a customer of a common carrier that is entitled to get services from the railroads at a particular rate, and that's the way it's always been. And under Respondent's approach, there would be both non-delegation problems and due process problems, apparently, with the type of thing that occurred in Boston v. Maine, where this Court held that Amtrak was able to initiate a condemnation proceeding for rail property before the ICC, and its determination that it needed that particular property had a strong presumption that it was going to be true and governing in that proceeding. This Court held that that was not an impermissible delegation of eminent domain authority because the ICC made the ultimate determination there, notwithstanding the fact that Amtrak had to trigger the proceeding and Amtrak's decision to do so created a statutory presumption that there would be a need. I think that Mr. Dupree also is concerned about the need for Amtrak's consent here. This goes back to the very first argument we have in our brief, that under cases like Curran and Rockwell Cooperative, the fact that the government needed to secure the consent of Amtrak is not something that makes that a delegation outside the government. Even though they had the pen along the way, the veto power is what is most important. And we think it's especially easy to get there in a context of an entity like Amtrak, which is at worst for us quasi-private rather than entirely private. And we think if you take that into account here, also the limited effect that the metrics and standards have, that this is not a non-delegation problem for any of the three problems the court of appeals believe. Roberts. Thank you, counsel. The case is submitted.